Matter of Alicia SS. v Andrew RR. (2024 NY Slip Op 01144)

Matter of Alicia SS. v Andrew RR.

2024 NY Slip Op 01144

Decided on February 29, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:February 29, 2024

CV-23-0468
[*1]In the Matter of Alicia SS., Petitioner,
v
Andrew RR., Appellant.

Calendar Date:January 8, 2024

Before:Garry, P.J., Pritzker, Lynch, Fisher and Powers, JJ.

Lisa K. Miller, McGraw, for appellant.
Andrea J. Mooney, Ithaca, attorney for the children.

Lynch, J.
Appeal from an order of the Family Court of Chemung County (Richard W. Rich Jr., J.), entered January 23, 2023, which granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, to modify a prior order of custody.
Petitioner (hereinafter the mother) and respondent (hereinafter the father) are the parents of two children (born in 2012 and 2014). In October 2018 — while the mother was incarcerated on a probation violation [FN1] — Family Court (McAllister, J.), Steuben County, issued an order on consent awarding the parties joint legal custody, with physical custody to the father. The mother was precluded from exercising visitation while incarcerated, but was allowed reasonable phone contact. After her release in March 2019, the mother relocated to North Carolina while the children continued to reside with the father. In June 2021, the father arranged for the children to reside with the mother in North Carolina after being evicted from his residence. The mother enrolled the children in school for the 2021-2022 academic year. In June 2022, the children returned to New York for summer visitation with the father. When the father advised the mother that he was keeping the children in New York, she filed a modification petition seeking to maintain the joint legal custody award set forth in the 2018 order, while awarding her primary physical custody. Following fact-finding and Lincoln hearings, Family Court (Rich Jr., J.) granted the mother's petition and awarded her primary physical custody of the children, with a schedule of parenting time for the father. The father appeals.[FN2]
The father initially argues that Family Court erred in finding that the mother satisfied her threshold burden of demonstrating a change in circumstances since entry of the prior order, contending that neither the mother's release from custody nor the children's stay in North Carolina justified reconsidering the prior custody award in his favor. We disagree. In its decision transferring primary physical custody to the mother, Family Court noted that the prior order resulted from the mother's incarceration and, by extension, her lack of a safe home environment. This circumstance was remedied by the mother's release from custody and subsequent move to North Carolina, where she obtained employment and stable housing. Thereafter, it was the father who initiated and arranged for the children to live with the mother in North Carolina. Since the prior order limited the mother's contact with the children due to her incarceration, her release constitutes a change in circumstances (see Matter of Leah V. v Jose U., 195 AD3d 1120, 1121 [3d Dept 2021]; Matter of Jessica D. v Michael E., 182 AD3d 643, 644 [3d Dept 2020]). That is all the more so when combined with the other developments that occurred since the 2018 order — including the mother's attainment of suitable housing and employment, and the children's lengthy stay with her in North Carolina for over a year. As such[*2], Family Court correctly determined that a change in circumstances had been shown warranting a best interests review.
In that regard, we discern no basis to disturb Family Court's determination that, at the time of the fact-finding hearing, the best interests of the children were served by awarding the mother primary physical custody.[FN3] "In conducting a best interests analysis, courts must consider a variety of factors, including the quality of the parents' respective home environments, the need for stability in the child[ren]'s li[ves], each parent's willingness to promote a positive relationship between the child[ren] and the other parent and each parent's past performance, relative fitness and ability to provide for the child[ren]'s intellectual and emotional development and overall well-being" (Matter of Christopher L. v Paula L., 212 AD3d 1060, 1061 [3d Dept 2023] [internal quotation marks and citations omitted]; see Matter of Thomas BB. v Jessica YY., 219 AD3d 1578, 1580 [3d Dept 2023]). "Where, as here, the practical effect of granting [a] request for modification of custody would be relocation of the child[ren], relocation must be considered within that framework" (Matter of Christopher TT. v Lisa UU., 211 AD3d 1371, 1372 [3d Dept 2022] [internal quotation marks and citations omitted]). Family Court's credibility determinations are "accord[ed] great deference" and its findings will not be disturbed "if supported by a sound and substantial basis in the record" (Matter of Joshua PP. v Danielle PP., 205 AD3d 1153, 1155 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 901 [2022]).
During the fact-finding hearing, the father explained that in June 2021 his housing situation was unstable and he consented to the children residing with the mother in North Carolina while he attempted to remedy the situation. The maternal step-grandmother recounted a different story, testifying that the father called to advise that he could not handle the children anymore. In response, the step-grandmother arranged to have the children brought to her residence in Tennessee, where they remained for a few days before being transferred to the mother. The step-grandmother testified that the children displayed "very concerning" and out-of-character behavior at that time.
In December 2021, the father made an unannounced trip to visit the children for Christmas. The children were in Tennessee visiting the maternal grandparents at the time, but the mother arranged for the father to see them despite a lack of prior notice. The step-grandmother testified that, during this visit, the father told the parties' son that he wanted him to move back to New York and, after putting the children to bed, the father came downstairs crying and left. According to the step-grandmother, the children were "traumatized" and told her that they did not want to go back to New York with the father but also did not want to hurt his feelings.
Although the father [*3]indicated that he originally intended to send the children back to North Carolina after the summer 2022 visit, he became concerned after seeing a photograph of the parties' daughter lying with only a blanket wrapped around her on top of the mother's boyfriend, who did not have a shirt on but was wearing shorts. In the photograph, both the boyfriend and the daughter appear to be asleep. During her testimony, the mother explained that she was the one who took the picture, maintaining that she did so because she thought it captured a "sweet" moment between them. The boyfriend, who had no criminal or Child Protective Services (hereinafter CPS) history, also explained the circumstances underlying the picture, emphasizing that it was summertime and he was reading a book to the child, who asked for a back rub and then fell asleep on top of him. Not wanting to move the child, he ended up falling asleep as well. Following an investigation ordered by Family Court pursuant to Family Ct Act 
§ 1034, CPS reported no concerns in this regard.[FN4] During the fact-finding hearing, the father revealed that his concerns had also abated since the court had "done [its] due diligence."
As for the remainder of the evidence, the testimony demonstrates that the father had engaged in disconcerting behavior directed at the mother. He admitted that, during the mother's incarceration, he posted sexually graphic videos of her on Facebook, conceding that he did so to be "vindictive." In November 2021, the father sent the mother a text message containing a link to a home he had purchased. While the mother was showing the children pictures of the home, the father then texted her a sexually explicit photograph of himself. Although the father maintained that he did not know the children were looking at the mother's phone when he did so, the boyfriend testified that he directly called the father about the photograph and the father laughed.
Although both parties were employed at the time of the fact-finding hearing, the testimony demonstrated that the mother was better equipped to provide an appropriate home environment to the children. When the children were living in North Carolina, the mother played an active role in their education, promptly enrolling the children in school. Recognizing that the son was behind in reading and writing comprehension, the mother arranged for him to have additional help and his reading comprehension improved.
When the father enrolled the children in school for the 2022-2023 academic year, the son got into trouble, threatening to bring in a gun after maintaining that he was being bullied. In response, the father grounded the child for only 24 hours and did not enroll him in counseling. The mother, by contrast, displayed a better understanding of the seriousness of the son's conduct, describing it as a "very major" situation and explaining that she was upset that the father had only grounded him for 24 hours. The mother was concerned that the son's behavior [*4]stemmed from the video games he was playing at the father's house, explaining that she limited screen time to two hours on weekdays and four hours on weekends. As for her contact with the children after July 2022, the mother testified that the son was often with the paternal great-grandmother and, during video calls with the daughter, the child was often "fending for herself" while the father played video games.
On this record, we conclude that there is a sound and substantial basis to support Family Court's determination that the children's bests interests would be served by awarding the mother primary physical custody — a determination with which the attorney for the children agrees. The mother had a stable home environment in North Carolina, had enrolled the children in school while they were in her care, and had maintained a structured home environment for them. The mother also ensured that the children stayed in touch with the father while they were living with her and accommodated his request for a visit on short notice. Although the photograph of the daughter gives us pause, Family Court was satisfied with the CPS investigation and report. By contrast, the testimony at the fact-finding hearing revealed that the father had engaged in highly inappropriate behavior toward the mother and displayed a lack of understanding about the seriousness of the son's behavior at school. Deferring to Family Court's credibility determinations and viewing the record as a whole, we discern no basis upon which to disturb the award of primary physical custody to the mother (see Matter of Satema C. v Stephen D., 221 AD3d 1304, 1307 [3d Dept 2023]; Matter of Joshua PP. v Danielle PP., 205 AD3d 1153, 1160 [3d Dept 2022], lv denied 39 NY3d 901 [2022]).
Garry, P.J., Pritzker, Fisher and Powers, JJ., concur.
ORDERED that the order is affirmed, without costs.

Footnotes

Footnote 1: During the fact-finding hearing, the mother explained that she was incarcerated for eight months due to a probation violation in connection with a conviction of criminal possession of a forged instrument. She testified that the probation violation stemmed from being outside of the County.

Footnote 2: In early January 2024, this Court's Clerk's office sent a letter to the parties seeking a status update on any further developments that have occurred since entry of the order on appeal. The father advised that the children remain living in North Carolina with the mother.

Footnote 3: Although not dispositive, we note that the attorney for the children on appeal supports the award of primary physical custody to the mother.

Footnote 4: We have reviewed a copy of the CPS report.